Merrimack
No. 2008-598

NICHOLAS GILMAN, TRUSTEE OF THE NICHOLAS GILMAN TRUST

v.

LAKE SUNAPEE PROPERTIES, LLC

Argued: April 7, 2009
Opinion Issued: June 17, 2009

*Orr & Reno, P.A.*, of Concord (*James P. Bassett & a.* on the brief, and *Mr. Bassett* orally), for the petitioner.

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*Christopher Cole* and *Courtney H.G. Herz* on the brief, and *Mr. Cole* orally), for the respondent.

DUGGAN, J. The petitioner, Nicholas Gilman, Trustee of the Nicholas Gilman Trust (Gilman Trust), appeals the decision of the Superior Court (*Conboy*, J.), granting the motion to dismiss of the respondent, Lake Sunapee Properties, LLC. We reverse and remand.

The record supports the following facts. Each party owns an undivided one-half interest in a seventy-two acre parcel located on Davis Hill Road in New London. The property has approximately 2667 feet of frontage on Lake Sunapee and approximately 2200 feet of frontage on Davis Hill Road. Several buildings are located on the property, including a residence, a boathouse and a studio.

Charmain Byers-Jones and Bartram H. Woodruff inherited the property by will from their father, G. Bartram Woodruff, upon his death in 1969. Charmain Byers-Jones conveyed her one-half interest to the Gilman Trust by deed dated April 1, 1980. Bartram H. Woodruff conveyed his one-half interest to the Bartram Haines Woodruff Family Trust by deed dated October 15, 1986. The Bartram Haines Woodruff Family Trust then conveyed its interest to Lake Sunapee Properties, LLC (LSP) by deed

dated May 14, 2004. Charmain Byers-Jones and her family have been the primary occupants of the property, using it as a seasonal residence.

In February 2005, following years of disagreements between the brother and sister over the property, LSP filed a petition in probate court to partition the property. The Gilman Trust objected to a physical partition and requested a financial partition, permitting the Gilman Trust to purchase LSP's interest at fair market value. The Gilman Trust argued "that the real estate could not be equitably divided, and . . . that if there were to be a division of property, the equities required an unequal division in its favor."

Following a bench trial, the Merrimack County Probate Court (*Hampe*, J.) ordered physical partition of the property. The probate court found that "[c]onsidering the size of this property and the extensive road frontage it is clear that [LSP] is entitled to have the property partitioned." The probate court noted that the parties submitted various proposals for subdivision at trial; it also noted, however, that "[n]either party presented the court with a [two] parcel subdivision plan although [LSP] presented a proposed . . . [thirteen] lot subdivision and a suggestion as to allotting the proposed lots in such a manner so that the parties could each have their share." The probate court found that this thirteen-lot subdivision "can be used to divide the interests of the parties." Based upon the evidence submitted, the probate court assigned values to each of the thirteen lots and then subdivided the property into Sublot A and Sublot B. Sublot A consisted of lots 1-7 and Sublot B consisted of lots 8-13. The probate court then found that because Byers-Jones and the Gilman family have been using the property as their summer home, they had "a greater emotional attachment to the property," and thus the probate court ruled that the Gilman Trust could elect either Sublot A or Sublot B and the other would go to LSP.

Disagreeing with the division of land, the Gilman Trust appealed to the superior court seeking a jury trial pursuant to RSA 547-C:3 (2007) (repealed 2008). LSP filed a motion to dismiss, claiming that because there is no right to a jury trial in equitable matters, the Gilman Trust did not have a right to appeal to the superior court. The superior court ruled that a right to a jury trial is not guaranteed by the New Hampshire Constitution in a partition action, and granted LSP's motion to dismiss. The Gilman Trust filed a motion to reconsider, which was denied. This appeal followed.

On appeal, the Gilman Trust argues it is entitled to a jury trial pursuant to Part I, Article 20 of the New Hampshire Constitution and RSA 547-C:3. Specifically, the Gilman Trust argues that: (1) the plain language of Part I, Article 20 provides for a jury trial in all controversies concerning property; (2) partition actions were tried by jury prior to the adoption of the New

Hampshire Constitution; and (3) based upon the facts of this case, there are questions of fact that should be heard by a jury.

RSA 547:3, I(k) (2007) (repealed 2008) vests the probate court with exclusive jurisdiction over petitions for partition pursuant to RSA chapter 547-C. RSA 547-C:3, however, provides: "In cases where a right to jury trial is guaranteed by the constitution, a person may, at the time judgment by the probate court is declared, appeal therefrom to the superior court." *See* RSA 547-C:2 (Supp. 2008). The Gilman Trust's statutory right to a jury trial is therefore conditioned upon whether it has a constitutional right to a jury trial.

Part I, Article 20 of the New Hampshire Constitution governs jury trials in civil cases and provides:

> In all controversies concerning property, and in all suits between 2 or more persons except those in which another practice is and has been customary and except those in which the value in controversy does not exceed $1, 500 and no title to real estate is involved, the parties have a right to a trial by jury.

Initially, we address the Gilman Trust's argument that the plain language of Article 20 guarantees a right to a jury trial in all property matters. The Gilman Trust argues that the exception of "those in which another practice is and has been customary" does not qualify "all controversies concerning property." Thus, because partition is a controversy concerning property, there is a right to a jury trial in all partition actions.

As the final arbiter of state constitutional disputes, we review the trial court's construction of constitutional provisions *de novo*. *Town of Canaan v. Sec'y of State*, 157 N.H. 795, 799 (2008). "To interpret the meaning of a constitutional provision, we examine its purpose and intent." *Id.* (brackets omitted). "In doing so, we will give the words in question the meaning they must be presumed to have had to the electorate when the vote was cast." *Id.* "The language used by the people in the great paramount law which controls the legislature as well as the people, is to be always understood and explained in that sense in which it was used at the time when the constitution and the laws were adopted." *Id.*

Originally, Article 20 provided:

> In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practiced, the parties have a right to a trial by jury; and this method of procedure shall be held sacred, unless in cases arising on the high seas, and such as relate to mariners wages, the legislature shall think it necessary hereafter to alter it.

Laws 1788 at 12; *see* N.H. CONST. pt. I, art. 20 (1987); *McElroy v. Gaffney*, 129 N.H. 382, 386 (1987). We originally interpreted this article to provide a two-part analysis: first, whether the controversy concerned property or involved two or more persons; and second, if it did, whether the controversy was one that was resolved by a jury at the time of the constitution's adoption. *See Cocheco Co. v. Strafford*, 51 N.H. 455, 457 (1871).

Article 20 has been amended three times, each in an attempt to limit the cases that can be heard by a jury. In 1877, the amendment inserted "and except in cases in which the value in controversy does not exceed one hundred dollars, and title to real estate is not concerned" preceding "the parties." N.H. CONST. pt. I, art. 20 (history) *in* 1 N.H. REV. STAT. ANN. 320 (2003). The subsequent amendments modified the amount in controversy. *Id.* In 1960, the amount in controversy was increased to five hundred dollars. *Id.* There were other unsuccessful attempts to increase the amount in controversy, *see, e.g.*, N.H. CONST. CONVENTION 577 (1974), prior to 1988, when Article 20 was amended and the value increased to $1,500. N.H MANUAL FOR THE GEN. CT. 365 (1989). Article 20 was also amended generally in 1988, with grammatical changes and word substitutions. *Compare* N.H. CONST. pt. I, art. 20 (1989), *with* N.H. CONST. pt. I, art. 20 (1987). The main purpose of the 1988 amendments, however, was to increase the amount in controversy. *See* C.A.C.R. 4 (1987); N.H.S. JOUR. 2065 (1987); N.H.H.R. JOUR. 1385 (1987). Thus, the original meaning of the article, and our analysis pursuant to it, has not changed. The two-part analysis articulated in *Cocheco Co.* and recently applied in *Hair Excitement v. L'Oreal U.S.A.*, 158 N.H. 363, 368 (2009), remains the law. The Gilman Trust's argument that, based upon the plain language of Article 20, the exception of "those in which another practice is and has been customary" does not qualify "all controversies concerning property" is without merit. We conclude that if the controversy concerns property but was not resolved by a jury at the time of the adoption of the constitution, no right to a jury trial exists. *See Cocheco Co.*, 51 N.H. at 457, 459 (holding tax abatement concerns property but no right to a jury trial exists); *Backus v. Lebanon*, 11 N.H. 19, 27 (1840) (holding no right to jury trial to determine damages for the taking of property for public use).

In this case, there is no doubt that a proceeding for partition is a controversy concerning property. *See, e.g., Foley v. Wheelock*, 157 N.H. 329, 333 (2008). This satisfies the first part of the analysis. The inquiry, therefore, is whether there was a right to a jury trial in partition actions at the time the constitution was adopted in 1784.

"To resolve whether a party has a right to trial by jury in a particular action, we generally look to both the nature of the case and the relief

sought, and ascertain whether the customary practice included a trial by jury before 1784." *Hair Excitement*, 158 N.H. at 368 (quotation omitted). Part I, Article 20 "was a recognition of an existing right, guaranteeing it as it then stood and was practiced, guarding it against repeal, infringement, or undue trammel by legislative action, but not extending it so as to include what had not before been within its benefits." *Id.* (quotation omitted). Our analysis, therefore, requires a historical discussion. As LSP points out in its brief, partition actions have consistently been described as matters in equity tried without a jury. Unlike most actions in equity, however, partition is unique in that it was originally tried by jury. Therefore, we first examine the history of the right to a jury trial in New Hampshire, and then discuss the history of partition actions in England and New Hampshire, focusing upon the transfer of partition actions to equity.

Our discussion of the right to a jury trial begins during the seventeenth century, when New Hampshire united with the Massachusetts Bay Colony. *See* 1 Province Period [Prov. Per.] 1679-1702 Appendix at 755. In 1641, through colonial legislation, New Hampshire adopted the Body of Liberties of the Massachusetts Bay Colony — the first elaborate scheme of statutory law. *Id.* One such liberty stated: "In all Actions at law it shall be the libertie of the plantife and defendant by mutual consent to choose whether they will be tryed by the Bench or by a Jurie, unlesse it be where the law upon just reason hath otherwise determined. The like libertie shall be granted to all persons in Criminall cases." *Id.* At that time, New Hampshire was "full of the English passion for trial by jury, intensified, if possible, by their experience in this country." *Copp v. Henniker*, 55 N.H. 179, 187 (1875).

In the code of 1680, New Hampshire secured for the people the right to be "tried by a Jury of Twelv good & lawful men, according to the commendable custom of England" in all matters, "whether Capital, or Criminal, or between man & man." Laws 1679, ch. 6; 1 Province Papers [Prov. Pap.] 395. This act provided that the parties could have a bench trial by agreement or if the court did not have trials by jury, "[i]n which case any party aggreeved [could] appeal, and shal have Trial by a Jury." Laws 1679, ch. 6; 1 Prov. Pap. 395. New Hampshire people were taught that the trial by jury was "a sacred institution" designed to "guard[] the rights of the jury from the encroachment of judges." J. REID, CONTROLLING THE LAW: LEGAL POLITICS IN EARLY NATIONAL NEW HAMPSHIRE 115 (2004) (quotation omitted).

During the seventeenth century, however, New Hampshire did not extend the right to a jury trial to all cases. For example, actions not exceeding a specified monetary amount that did not concern a dispute about title to land were tried to the bench. *See* Laws 1687, ch. 3 (justices of the peace may decide differences not exceeding 40 shillings and "wherein

the Title of Land is not Concerned"); Laws 1692, ch. 10 (courts "heare try & finally determine all actions & Causes of actions & all matters & things & Causes tryable at the Com'on Law of what nature or kind soever not Exceding twenty pound & where title of land is not Conserned"); 3 Prov. Pap. 219 (same); *see also* 1 Prov. Pap. 393 ("[I]f any difference or controversy shall hereafter arise amongst us about the titles of land . . . it shall not be finally determined but by a Jury of 12 able men . . . ." ).

Moreover, as our case law has explained:

> Probate jurisdiction, without the right to a jury trial, existed at common law prior to the adoption of the constitution, and therefore no such right has been created by the constitution. The right to request a jury trial in probate matters is purely statutory and may be granted or limited as the legislature sees fit. The legislature has granted no such right to a jury trial in probate court.

*In re Estate of Heald*, 147 N.H. 280, 282 (2001) (holding an estate executor, in an action for breach of fiduciary duty, does not have a constitutional right to a jury trial); *Petition of Atkins*, 126 N.H. 577, 578-79 (1985) (finding that there is no right to jury trial in a will contest where no material facts in dispute).

Finally, prior to 1784, equity matters in New Hampshire were tried to the bench. *See Dion v. Cheshire Mills*, 92 N.H. 414, 417 (1943) ("[I]f there be matter of apparent equity, as the forfeiture of an obligation, breach of Covenant without damage, or the like, the Bench shall determine such matters of equity." (quotation omitted)); *see also* Laws 1692, ch. 10 (debt and trespass tried without jury). "Never is there a suggestion that an equitable issue was submitted to a jury. Just as during the seventeenth century, denial of trial by jury in equity was the rule during all the subsequent colonial period." *Dion*, 92 N.H. at 418.

We now turn to the history of partition actions, and begin by examining partition as it existed originally in England. Partition has its origins in English common law, which provided for two types of partition: (1) voluntary by agreement; or (2) compulsory by court. A.C. Freeman, Cotenancy and Partition: A Treatise on the Law of Co-ownership as it Exists Independent of Partnership Relations Between the Co-owners § 394, at 504 (2d ed. 1886). Compulsory partition by the court dates back to 1272 and the reign of Henry III. *Id.* § 420, at 540. At that time, when an inheritance of real property went to more than one heir, and the heirs could not agree upon a division of the land, partition could be compelled by the following procedure: "A writ was for this purpose directed to four or five persons, who were appointed justices for the occasion, and

were to extend and appreciate the land by the oaths of good and lawful persons chosen by the parties . . . to be returned . . . [to] the king or his justices." *Id.* § 420, at 541. In voluntary partitions, the parties would also occasionally select individuals, known as commissioners, to divide the land. *Id.* § 396, at 506.

English common law subsequently evolved to include a jury. *Id.* § 421, at 544. The landowner would initially sue by writ of partition and the sheriff would summon the other cotenants named in the writ. *Id.* at 546. If the other cotenants appeared in the action, as opposed to suffering a default, the petitioning landowner would then file a declaration. *Id.* at 547. "If the action was confessed, or if after trial the issue was found for the plaintiff, there was entered in his favor an interlocutory judgment, . . . designat[ing] the persons between whom partition should be made, and also the moieties [money] to which each was entitled." *Id.* A judicial writ then issued, "whereupon 'the sheriff with a jury of twelve went upon the land, made a division of it and allotted the shares or purparts to the heirs respectively.' " *Duffy v. Maciag*, 431 A.2d 1233, 1234-35 (R.I. 1981) (quoting Loyd, *Partition*, 67 U. PENN. L. REV. 162, 167 (1919)).

Eventually, Parliament recognized that the common law partition process was "tedious, expensive, and sometimes ineffectual." FREEMAN, *supra* at 544. This was "by reason of the difficulty of discovering the persons and estates of the tenants . . . to be divided, and the defective or dilatory executing and returning of the process of summons, attachment, and distress, . . . by reason of which divers persons having undivided parts or purparts are greatly oppressed and prejudiced, and the premises are frequently wasted and destroyed . . . ." *Id.* (quotation omitted). As a result, chancery courts began to exercise jurisdiction in suits for partition without a jury. *Id.* at 546. A new method of partition thus developed wherein "by decree of chancery exercising its equitable jurisdiction on a bill filed, praying for a partition, in which it is usual for the court to issue a commission for the purpose to various persons, who proceed without a jury." 2 STORY, EQUITY JURISDICTION § 872, at 250 (W.H. Lyon, Jr. ed., 14th ed. 1918). Provided title was not in dispute, partition was a matter in equity. *Id.* § 879, at 257 ("And indeed if there are no suspicious circumstances, but the title is clear at law, the remedy for a partition in equity is as much a matter of right as at law.").

New Hampshire followed a similar pattern in the development of partition in equity. As in England, partition was originally by writ at common law and included a jury. *Cf. Crowell v. Woodbury*, 52 N.H. 613, 615 (1873) (discussing trajectory of "special partition" in cases of indivisible property). The acts passed during the seventeenth century reference the importance of the right of property and that any dispute of fact is to be

settled by a jury. *See* 3 Prov. Pap. 186 ("[N]o Person's Right of property shall be by any of the . . . courts determined, Except where matters of fact are either acknowledged by the parties, or . . . be found by . . . Twelve men of the neighborhood."); *see also* Laws 1714, ch. 1 (property owners "may be Compelled by writt of partition at the Common Law to Divide the Same, where the parties cannot agree to make partition thereof by themselves"). Thus, prior to adoption of the constitution, there was a clear reference to a right to a trial by jury in partition matters. Even more compelling, however, is the development of the probate court's jurisdiction over partition involving minors.

As stated above, partition was originally by consent or by jury. Because minors were unable to give consent, the law developed to provide an alternative method to consent. In the eighteenth century, petitions were regularly presented to the New Hampshire General Assembly requesting partition of land inherited by minors. *See* Laws 1784, ch. 1; Laws 1783, ch. 2; Laws 1779, ch.3; Laws 1778, ch. 2; Laws 1764, ch. 9; Laws 1763, chs. 6 & 7; Laws 1760, ch. 2; Laws 1758, ch. 3; Laws 1754, ch. 3; Laws 1747, ch. 6. Such petitions noted that because the heirs were minors, they could not consent, and that the alternative of partition by writ at common law before a jury would be expensive and tedious. Laws 1764, ch. 9 ("That the said Heirs being Minors they coud not make Division by consent & to do it by writ at common Law woud be such a Charge as the Said Heirs coud not well sustain and therefore Praying that the Judge of Probate might be Authorized to cause said Division to be made as in the Case of Intestacy as had been Done in other like Instances"). The General Assembly would then authorize the judge of probate to issue a warrant to five freeholders, known as commissioners, to divide the land according to law. *See, e.g.,* Laws 1760, ch. 2; Laws 1758, ch. 3.

On July 3, 1766, the General Assembly passed "An Act for a more easy & expeditious method of making Partition of Land or other real Estate held in Common." Laws 1766, ch. 2. This act provided:

> Whereas Petitions are often presented to the General Assembly for private Acts to authorize Partition & Division of Lands or other real Estate to be made in a Summary way, *to avoid the Expence & delay of making the same by a Jury* where Minors or others under any disability of making such Partition by mutual consent & deed are interested, whereby much of the time of the General Assembly is taken up in attention to private Affairs, for Remedy whereof
>
> Be it Enacted by the Governor Council & Assembly that the Judge of Probate of Wills & for granting Letters of administration on the Estates of Persons dying intestate within this Province be

> & hereby is authoris'd to cause a division or Partition of any Lands or other real Estate in this province held in common & undivided, where the Persons interested, or any of them so holding such Estate are Minors or under any disability to make partition thereof by deed, by five freeholders upon Oath upon the application of, or in behalf of any Party interested in the same manner & form as he is by Law authorized to do in cases of the division & settlement of the real Estates of Persons dying intestate, which division and Partition being so made & return'd to the said Judge & by him allow'd & approv'd, shall be adjudged a good partition & binding to all parties.

*Id.* (emphasis added). The 1766 act thus provided an alternative to the expense and delay of a jury trial when a minor was involved and consent was not an option. Instead, "five freeholders" could partition the property. Importantly, the language of this act indicates that, during this period, partition was commonly done either by consent or by jury. Thus, the historical record shows that, as of 1766, partition included trial by jury.

It was not until February 4, 1789, five years after the adoption of the constitution, that the probate court was given jurisdiction of all partition actions. Laws 1789, ch. 43. In that year, the General Assembly passed "An Act for the more easy Partition of Lands and other real Estate," which provided: "That upon the Application of any Person or Persons interested with others in any lot, tract or parcel of Land, or other real Estate . . . to the Judge of the Probate of Wills . . . , the said Judge be and he hereby is empowered to cause Partition of such land or other real Estate to be made . . . by a Committee of five freeholders to be appointed by the said Judge." *Id.* Like the British Parliament, the General Assembly, in passing this act, articulated that "the Parties concerned are numerous, live remote from each other, & some of them are sometimes unknown." *Id.* The General Assembly therefore authorized commissions comprised of five men acting at the direction of the probate court to partition land. *Id.* This process continued into the nineteenth century, when partition actions finally became equity matters. *See Crowell,* 52 N.H. at 615 ("[T]here can be no doubt but that this branch of equity jurisdiction was fully conferred upon the court, with other equity powers, by the act of 1832."); *Whitten v. Whitten,* 36 N.H. 326, 332 (1858) ("[T]he partition of real estate is an undoubted branch of equity jurisdiction."); *Morrill v. Morrill,* 5 N.H. 329, 330-31 (1831) ("When a judgment has been rendered on a petition of this kind, that partition be made, a committee is appointed, as directed by the statute, to make a division."), *overruled by Doughty v. Little,* 61 N.H. 365 (1881).

■ Based upon the foregoing, we conclude that there was a right to a jury trial in partition actions in 1784. Thus, at the time the constitution was adopted, the common method was either by consent or by jury. *See* Laws 1783, ch. 2 ("[C]ommon method for making partition of lands, as pointed out by the laws of the State, would be very troublesome and expensive."); Laws 1766, ch. 2 (noting expense and delay of making the same by jury); FREEMAN, *supra* at 547 (method for partition by writ at common law includes jury). It was not until after 1784, however, that partition became an action in equity under the jurisdiction of the probate court.

■ The Gilman Trust is therefore entitled to a jury trial in superior court pursuant to RSA 547-C:3. Because the Gilman Trust filed suit prior to the most recent version of RSA 547-C:3, it "may, at the time judgment by the probate court is declared, appeal therefrom to the superior court." The legislature, however, recently amended RSA 547-C:3 to provide the superior court with exclusive jurisdiction "in any such case where the right to a trial by jury is guaranteed by the constitution and is claimed by any party." RSA 547-C:2. Therefore, any future partition action where any party requests a jury trial must be originally heard in the superior court.

Because we conclude that our constitution provides for a right to a jury trial when requested in partition matters, we need not address the Gilman Trust's alternative argument that the specific facts of this case warrant a jury trial.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, J., concurred; HICKS, J., concurred specially.

HICKS, J., concurring specially. I agree with the majority that a jury trial likely was available at law to property holders seeking compulsory partition before adoption of the 1784 State Constitution. I write separately to discuss the contours of such right on remand. In addition to the normal pretrial procedures for screening triable issues, in my opinion the presiding justice has the authority pursuant to Superior Court Rule 73 to set aside the jury's decree if it offends the traditional notions of equity. *See* RSA 547-C:29 (2007) (listing equitable considerations); *cf.* RSA 547-C:10 (2007) (stating "the court shall have full power to determine the respective interests of all the parties"). *See generally* A.C. FREEMAN, COTENANCY AND PARTITION: A TREATISE ON THE LAW OF CO-OWNERSHIP AS IT EXISTS INDEPENDENT OF PARTNERSHIP RELATIONS BETWEEN THE CO-OWNERS § 505 (2d ed. 1886).

Whatever its genesis, it is undisputed that partition is now a matter calling heavily upon the court's equity powers. *Foley v. Wheelock*, 157 N.H.

329, 333 (2008); *DeLucca v. DeLucca*, 152 N.H. 100, 104 (2005); *Gordon v. Gordon*, 117 N.H. 862, 864 (1977); *Hale v. Jaques*, 69 N.H. 411, 412 (1898). While the pre-1784 jury trial right in partition actions developed in New Hampshire only at law, elsewhere the equitable jurisdiction over such matters became well-established. *Crowell v. Woodbury*, 52 N.H. 613, 615 (1873); Loyd, *Partition*, 67 U. PA. L. REV. 162, 168-69, 173 (1919). The state's functional lack of an effective and independent judiciary in 1784 cannot be gainsaid, J. REID, LEGISLATING THE COURTS: JUDICIAL DEPENDENCE IN EARLY NATIONAL NEW HAMPSHIRE 9, 24 (2009), and likely accounted for the lack of equitable powers in New Hampshire courts, *Copp v. Henniker*, 55 N.H. 179, 210-11 (1875); *Crowell*, 52 N.H. at 615. Doubtless had our courts been vested with such power, the jury's role in partitions would have been narrower. *See Copp*, 55 N.H. at 211; 1 J. POMEROY, A TREATISE ON EQUITY JURISPRUDENCE § 116, at 136 (4th ed. 1918) (jury is ill-equipped "to frame and deliver a decree according to the doctrines and methods of equity . . . .").

Although later acts governing partition vested the court with certain equitable power, *see Crowell*, 52 N.H. at 616, such legislative delegations typically cannot alter the substantive pre-1784 jury trial right. *See Copp*, 55 N.H. at 198. Other constitutional provisions may, however, and the superior court's general equity power became constitutionally vested in 1966 as part of the "judicial power" conferred by Part II, Article 72-a of the New Hampshire Constitution. *Cf.* U.S. CONST. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity . . . ."); *Richardson v. Sport Shinko (Waikiki Corp.)*, 880 P.2d 169, 182 (Haw. 1994).

Consequently, I do not read the majority's opinion as relieving the court's duty to set aside an inequitable remedy. *See Copp*, 55 N.H. at 211 (right to jury trial in equity case is proper only "under the direction of the court"); *Hampton v. Palmer*, 99 N.H. 143, 146 (1954) (permitting equity to assume jurisdiction when the constitutional jury trial at law provides incomplete relief); FREEMAN, *supra* § 515 (stating that court of equity will intervene to prevent inequitable partition at law); *cf. Baltimore & C. Line v. Redman*, 295 U.S. 654, 659 (1935) (legal rulings made after jury verdict not violative of Seventh Amendment right to jury trial).